UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Wendy Goodwin

    v.                          Civil No. 12-cv-414-JD
Liberty Life Assurance Co.      Opinion No. 2014 DNH 047
of Boston d/b/a Liberty
Mutual Group, Inc.

O R D E R

Wendy Goodwin brought suit under the Employee Retirement
Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., seeking
to overturn the decision of Liberty Life Assurance Co. of Boston
("Liberty") to terminate her long term disability ("LTD")
benefits.  The parties have both moved for judgment on the
administrative record.  See L.R. 9.4(c).

Standard of Review

The standard of review in an ERISA case differs from that in
an ordinary civil case, where summary judgment is designed to
screen out cases that raise no trialworthy issues.  See, e.g.,
Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir.
2005).  "In the ERISA context, summary judgment is merely a
vehicle for deciding the case," in lieu of a trial.  Bard v.
Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006).  Rather
than consider affidavits and other evidence submitted by the
parties, the court reviews the denial of ERISA benefits based
"solely on the administrative record," and neither party is
entitled to factual inferences in its favor.  Id.  Thus, "in a

very real sense, the district court sits more as an appellate tribunal than as a trial court" in deciding whether to uphold the administrative decision.  Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002).

### Background[1]

Wendy Goodwin was employed by The Timberland Company ("Timberland") as a customer fulfillment database administrator, a sedentary job, since 1987.  As a Timberland employee, Goodwin was eligible for and participated in the company's long-term disability insurance plan ("Plan"), offered through Liberty.

To receive benefits under the Plan, an employee must be certified as disabled by Liberty.  The Plan defines a disabled employee as one who "as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of . . . [the employee's] occupation that [she] was performing when [her] Disability . . . began."

On January 23, 2006, Goodwin had a CT scan of her abdomen and pelvis because of stomach pain.  Following the scan, Goodwin was examined by Dr. Peter Carter on two occasions in early February of 2006.  On or about February 15, 2006, Dr. Carter performed surgery on Goodwin to repair a ventral incisional

---

[1]The parties' joint statement of material facts does not comply with Local Rule 9.4(b).  The court will consider the parties' motions in the interest of avoiding unnecessary delay.

hernia.[2]  At a follow-up appointment on March 8, 2006, Dr. Carter prescribed Ciprofloxacin, an antibiotic, because Goodwin appeared to have a possible infection at the incision site.  He also prescribed pain medication.

Goodwin saw Dr. Carter on March 24 and April 7, 2006. During the March 24 appointment, Dr. Carter noted that the antibiotic was helping to treat the infection.  During the April 7 appointment, Dr. Carter noted that the incision had healed adequately, but that Goodwin had a "mild keloid formation" and a "moderate amount of discomfort."  Dr. Carter advised Goodwin to return to work but to remain on "light duty for this next month."[3]

Goodwin saw Dr. Carter again on May 3, 2006.  Dr. Carter noted that Goodwin continued to have discomfort, mostly while sitting, in the area of the incision.  He ordered an ultrasound of Goodwin's stomach and a pain consultation.

Goodwin saw Dr. Christopher Delorie for the pain consultation on May 10, 2006.  Dr. Delorie noted that the "area along the scar seems boggy and inflammed [sic]."  He prescribed Tramadol for Goodwin's pain.  Dr. Delorie also noted that the "next option would be . . . infiltration of the scar and deeper tissues with local and steroid."

---

[2]Goodwin also told Dr. Carter that she had surgery in 2004 to repair an umbilical hernia.

[3]It is unclear whether Goodwin returned to work at that point or at any point prior to early October of 2006.

Goodwin saw Dr. Carter on May 17, 2006, to discuss the results of the ultrasound.  According to Dr. Carter, the ultrasound showed a "collection of fluid" in Goodwin's abdomen. Dr. Carter prescribed codeine for Goodwin, and referred her back to Dr. Delorie for "some injections to soften up the scar tissue."  Goodwin saw Dr. Delorie on May 23, 2006, and received a nerve block injection to ease her pain.

On May 31, 2006, Goodwin saw Dr. William Gilbert of Kittery Family Practice.  Dr. Goodwin wrote Goodwin prescriptions for two pain medications: Gabapentin and Darvocet (also known as propoxyphene napsylate).  Over the next several months, Goodwin received and filled renewed prescriptions for these medications from Dr. Gilbert.

Goodwin saw Dr. Carter on July 18, 2006.  Dr. Carter did not think that Goodwin's pain was being caused by the collection of fluid shown on the ultrasound.  He thought Goodwin may be having a reaction to the suture used to close the incision from her previous operation.  On August 8, 2006, Goodwin underwent a "[d]ebridement of scar tissue, excision of Prolene suture, evacuation of seroma . . . . [and] repair of small incisional hernia."

Goodwin saw Dr. Carter on August 24, 2006, to examine her for a "possible wound infection" after her August 8 procedure. Dr. Carter thought that Goodwin was having a "superficial reaction to the suture material" and noted that he was "at a loss

4

as to why [Goodwin] has so much discomfort." Dr. Carter prescribed Darvocet for Goodwin's pain.

Goodwin saw Dr. Carter again on September 7, 2006. Dr. Carter noted that he had never had a "patient with this much chronic pain for the entire duration of my career, so I am perplexed regarding what could be contributing to her discomfort." Dr. Carter also expressed concern "about the amount of Darvocet and Tylenol [Goodwin] has been taking." Dr. Carter wrote Goodwin a prescription for Tramadol.

Goodwin next saw Dr. Carter on September 28, 2006. Dr. Carter encouraged Goodwin to return to work. He directed her to see him again in one month, at which point "the inflammation should subside, and she should feel better." He also wrote her a prescription for Hydrocodone, a pain medication. It does not appear that Goodwin saw Dr. Carter the following month or at any point after the September 28 appointment.

Goodwin returned to work in early October 2006. Around this time, Dr. Gilbert wrote Goodwin prescriptions for two pain medications: Cymbalta (also known as Duloxetine) and Lidoderm patches. Goodwin also requested, and apparently received, a new prescription for Darvocet from Dr. Frederick Thaler of Kittery Family Practice. Goodwin stopped going to work in late October or early November 2006.

Shortly after Goodwin stopped going to work, she completed a Disability Claim Form for LTD benefits. On the form, she

5

reported "[p]ersistent severe abdominal incisional pain related to surgeries performed on 2/15/06 and 8/8/06."  Goodwin's claim was approved, and she began receiving LTD benefits on March 6, 2007.[4]

On February 19, 2007, Goodwin completed an Activities Questionnaire for Liberty.  On the questionnaire, Goodwin wrote that she could sit upright for less than an hour, walk for up to fifteen minutes when necessary, and drive a car for thirty minutes.

In March of 2007, Dr. Gilbert completed a Restrictions Form concerning Goodwin for Liberty.  Dr. Gilbert indicated that Goodwin suffered from "constant abdominal incisional pain" and that they "have exhausted all treatment options."

On March 26, 2007, Liberty sent a letter to Dr. Gilbert asking for his opinions on Goodwin's ailments so that "we may continue processing [Goodwin's] disability claim."  Dr. Gilbert completed the form on or about April 2, 2007.  Dr. Gilbert again indicated that he has "exhausted all treatment options."  He also wrote that Goodwin was "unable to work."

On April 23, 2007, the Social Security Administration ("SSA") issued a "Notice of Disapproved Claim" concerning Goodwin's claims for social security disability benefits.

---

[4]Goodwin's last day of work for disability purposes was deemed to be August 7, 2006.

On May 4, 2007, Dr. Gilbert completed another Restrictions Form concerning Goodwin.  Dr. Gilbert indicated that Goodwin was not capable of performing even sedentary work, and stated that "I have nothing else to offer her at this point."

On October 18, 2007, Goodwin saw Dr. Joshua Greenspan at Paincare Centers.  Dr. Greenspan noted that Goodwin reported that her pain had become more manageable and she had improved since starting chronic narcotic therapy.  Goodwin also told Greenspan, however, that she was in constant pain in her stomach, and that her pain was aggravated by "activity, driving, lying down, sitting, standing, walking, bending, lifting, prolonged positions, sneezing, [and] coughing."  Dr. Greenspan prescribed two medications to help Goodwin manage her pain: Namenda and Opana.  In addition, Goodwin continued to take Hydrocodone and Darvocet throughout 2007, both of which were prescribed by Dr. Gilbert.

On December 16, 2007, the SSA issued another "Notice of Unfavorable Decision" concerning Goodwin's claim for social security disability benefits.

On February 5, 2008, Dr. Greenspan completed a Restrictions Form for Liberty.  Dr. Greenspan indicated that he "cannot comment on degree of disability," but stated only that Goodwin had "no mental or cognitive restriction."

On February 8, 2008, a doctor at Kittery Family Practice returned an unsigned Restrictions Form to Liberty.[5]  The form indicated that Goodwin "can not even do sedentary work" and that the doctor who filled out the form "do[es] not see [Goodwin] returning to work until pain issue is resolved."  The doctor also indicated that "I have no other treatment."

On March 8, 2008, a "vocational consultant," Teresa Marques, prepared an Occupational Analysis concerning Goodwin.  Marques indicated that Goodwin's job "is at the sedentary physical demand level with primarily sitting, occasional intermittent standing, and walking and lifting up to 10 pounds."

On March 10, 2008, Dr. Gilbert completed another Restrictions Form.  Dr. Gilbert indicated that he had not seen Goodwin since September 11, 2007, but opined that she was "unable to work in any capacity at present."

That same day, a field investigator interviewed Goodwin.  He observed that she "walked gingerly and appeared to be in pain." Goodwin told the investigator that she is unable to walk or exercise, that she remains inside all day, and that she is only able to drive when she is not taking any medications, which is rare.

On or about June 27, 2008, Goodwin completed another Activities Questionnaire.  She indicated on the questionnaire

─────────────

[5]Although the form was unsigned, Liberty addressed the letter enclosing the Restrictions Form to Dr. Gilbert.

that she could sit upright for ten to fifteen minutes, walk or
stand for fifteen to twenty minutes, was unable to drive a car
and could sit in a car for fifteen to thirty minutes.

Around this time, Liberty hired a company to do a
surveillance investigation on Goodwin.  Surveillance was
conducted on Goodwin on June 30, July 1, and July 2, 2008.  A
report was issued and sent to Liberty on July 14, 2008, along
with a surveillance video.  The report stated that Goodwin rode
as a passenger in a car on July 1 and July 2 while another person
drove the car, and that the car made several stops each day.

On or about July 23, 2008, Dr. Gilbert responded to
Liberty's request for additional information concerning Goodwin.
Dr. Gilbert indicated that Goodwin was "unable to work in any
capacity" and that she could perform "less than sedentary work."

Surveillance was again conducted on Goodwin on September 18,
September 19, September 20, and September 23, 2008.  A report was
issued and sent to Liberty on September 29, 2008, along with a
surveillance video.  The report stated that the investigator
observed Goodwin walking "in what appeared to be a normal
fashion."  Goodwin traveled in a car to and attended a hearing on
her claim for social security disability benefits at the SSA on
September 18.  Goodwin rode as a passenger in the car for twenty
to thirty minutes to and from the hearing.[6]  She attended the

---

[6]Liberty states in its motion that the ride to and from the
SSA was approximately ninety minutes.  That assertion is contrary
to the times listed in the surveillance report.

hearing for approximately two and a half hours.  The investigator
did not observe Goodwin on any day other than September 18.

On or about October 30, 2008, Dr. Gilbert responded to
Liberty's second request for additional information concerning
Goodwin.  Dr. Gilbert again indicated that Goodwin was "unable to
work [in] any capacity."

On October 31, 2008, the SSA issued a "Notice of Decision -
Fully Favorable" concerning Goodwin's claim for disability
benefits.

Liberty arranged for Goodwin to undergo an independent
medical examination ("IME").  The IME was conducted on January 6,
2009, by Dr. Stuart Glassman.  Dr. Glassman observed that
Goodwin's "ongoing pain complaints appear to be more subjective
than objective in nature."  He opined that Goodwin "is more
functional than what she self-reports" and "would have a full
time light duty work capability, lifting 20 pounds maximally and
10 pounds frequently, 8 hours a day, 5 days a week."

At the end of January of 2009, Liberty sent the IME to Dr.
Gilbert for comments.  Dr. Gilbert did not respond within the
requested time.  By letter dated February 16, 2009, Liberty
advised Goodwin of its determination that she no longer met the
Plan's definition of disability and, therefore, that benefits
were not payable beyond February 13, 2009.

On April 3, 2009, Dr. Gilbert responded to Liberty's request
for comments on the IME.  Dr. Gilbert indicated that he disagreed

10

with Dr. Glassman's opinion concerning Goodwin's functionality,
and stated that she was not able to lift up to twenty pounds or
lift ten pounds frequently in an eight hour day.  Dr. Gilbert
also wrote that he "feel[s] at this time [Goodwin] is not
employable in any capacity."

By letter dated August 13, 2009, Goodwin requested a "review
of the decision to terminate [her] benefits."  In support of her
appeal, Goodwin submitted the SSA's October 31, 2008, decision
and records from Kittery Family Practice.  The appeal was
referred to Dr. Milton Klein for review.  Dr. Klein issued his
report on October 26, 2009, opining that Goodwin "does have the
capacity to sustain full-time work (8 hours per day, 5 days per
week) as she does not demonstrate any documented evidence of
neuromuscular impairment that would support restrictions or
limitations."

By letter dated October 30, 2009, Liberty advised Goodwin
that it was "unable to alter our original decision to deny
benefits beyond February 13, 2009."   Goodwin filed this action
on October 29, 2012.


<u>Discussion</u>

Goodwin argues that her challenge should be reviewed de novo
because the Plan does not give Liberty discretionary authority to
determine eligibility for benefits.  She further argues that,
under either the de novo standard or the deferential standard,
she is entitled to judgment because Liberty's termination of her

11

LTD benefits is unsupported by the medical evidence in the administrative record and is arbitrary and capricious.  Liberty argues that the Plan grants it discretionary authority to determine eligibility for benefits so its decision must be upheld unless it was arbitrary and capricious, which it was not.  It further argues that even if the court uses the de novo standard on review, the termination of Goodwin's benefits is supported by the administrative record in any event.

A.   <u>Deferential or De Novo Review</u>

A case challenging the denial or termination of benefits under ERISA is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>see also</u> <u>Matias-Correa v. Pfizer, Inc.</u>, 345 F.3d 7, 11 (1st Cir. 2003); <u>Brigham v. Sun Life of Canada</u>, 317 F.3d 72, 80 (1st Cir. 2003).  If the benefit plan gives the administrator discretionary authority, "the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion."  <u>Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan</u>, 402 F.3d 67, 74 (1st Cir. 2005).  To trigger the arbitrary and capricious standard, "the grant of discretionary authority must be clear."  <u>Terry v. Bayer Corp.</u>, 145 F.3d 28, 37 (1st Cir. 1998); <u>see also</u> <u>Rodriguez-Abreu v. Chase Manhattan Bank, N.A.</u>, 986 F.2d 580, 583 (1st Cir. 1993).

12

Goodwin argues that Liberty's decision should be reviewed de novo because the Plan's terms are "unclear, conflicting and ambiguous."  In support, she points to the following clause in the Plan: "When Liberty receives proof that a Covered Person is Disabled due to Injury or Sickness and requires the regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period . . . ."  Although Goodwin acknowledges that other clauses in the Plan appear to grant Liberty discretionary authority, she argues that this clause does not give Liberty the right to determine whether proof of disability is sufficient and, therefore, the Plan is ambiguous and should be construed against the drafter, Liberty.

Liberty argues that the Plan clearly grants it discretionary authority.  It points to three clauses to support its argument. The first provides that "Liberty shall possess the authority in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder."  The second provides that "[p]roof [of disability] must be submitted in a form or format satisfactory to Liberty."  The third provides that "Liberty reserves the right to determine if the Covered Person's Proof of loss is satisfactory."

The First Circuit has held that language in a benefits plan giving an insurer "sole discretion" to determine eligibility was sufficient to convey discretionary authority.  See Leahy, 315 F.3d at 15 ("discretionary grant hardly could be clearer" where the plan documents gave the insurer "'the exclusive right, in

13

[its] sole discretion, to interpret the Plan and decide all matters arising thereunder'"); <u>see also</u> <u>McCabe v. Liberty Life Assur. Co. of Boston</u>, 2011 WL 4499998, at *1 (D.N.H. Sept. 27, 2011). In addition, language that suggests that proof must be satisfactory to the insurer is sufficient to vest discretionary authority in the insurer. <u>See</u> <u>Brigham</u>, 317 F.3d at 81 (adopting the view that language such as "'to us' after 'satisfactory' [is] an indicator of subjective, discretionary authority on the part of the administrator, distinguishing such phrasing from policies that simply require 'satisfactory proof' of disability, without specifying who must be satisfied"); <u>see also</u> <u>Figueiredo v. Life Ins. Co. of N. Am.</u>, 709 F. Supp. 2d 137, 144 (D.R.I. 2010).

Goodwin cites no authority to support her theory that despite a clear grant of discretionary authority in a plan, a potential lack of clarity in other plan terms can support application of the de novo standard. Accordingly, the court will apply the deferential standard of review.[7]

---

[7]Because Liberty, as the plan administrator and insurer, both makes eligibility determinations and pays benefits, a structural conflict of interest exists. <u>See</u> <u>Met. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 111 (2008). Goodwin, however, did not raise the issue, much less show that the conflict influenced Liberty's decision. <u>See</u> <u>Cusson v. Liberty Life Assurance Co. of Boston</u>, 592 F.3d 215, 225 (1st Cir. 2010). Therefore, the court applies the deferential standard without considering the effect, if any, of the structural conflict.

B.   Termination of LTD Benefits

Under the arbitrary and capricious standard, the court can overturn a defendant's termination decision only if it finds "that the insurer's eligibility determination was unreasonable in light of the information available to it."  Cooke v. Liberty Life Assur. Co. of Boston, 320 F.3d 11, 19 (1st Cir. 2003); see also Wright, 402 F.3d at 74 (the court must decide "whether the aggregate evidence . . . could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits").  The standard is "generous" to the administrator, but "is not a rubber stamp."  Wallace v. Johnson & Johnson, 585 F.3d 11, 15 (1st Cir. 2005).  A decision to deny or terminate benefits will be upheld so long as it was "reasoned and supported by substantial evidence."  Medina v. Metro. Life Ins. Co., 588 F.3d 41, 45 (1st Cir. 2009).  "Evidence is substantial if it is reasonably sufficient to support a conclusion."  Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 87 (1st Cir. 2008). "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision."  Wright, 402 F.3d at 74.

Goodwin faults Liberty for giving minimal weight to the opinion of her treating physician, Dr. Gilbert, and relying heavily on the opinions of Dr. Glassman and Dr. Klein.  She argues that Dr. Glassman's opinion was not entitled to great weight because it did not consider any medical evidence prior to October 21, 2008, and because his opinion was refuted by Dr.

Gilbert's April 3, 2009, letter.  She also contends that Dr. Klein's opinion was flawed in that he only appears to have reviewed Dr. Gilbert's Restrictions Form dated May 4, 2007, and in that he does not explain why Goodwin had improved since Liberty found that she was disabled prior to February 13, 2009. Liberty argues that it properly relied on Dr. Glassman's and Dr. Klein's opinions, as well as the surveillance investigation reports, and that its decision is supported by substantial evidence.

    1.  <u>Dr. Gilbert</u>

Goodwin argues that Liberty's decision cannot stand because it "gives minimal weight, if any, to the medical opinions of her regularly attending physician," Dr. Gilbert, who repeatedly stated that Goodwin was unable to work in any capacity.  "[T]he opinion of the claimant's treating physician, [however], . . . is not entitled to special deference."  <u>Orndorf</u>, 404 F.3d at 526 (citing <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 831 (2003)).  Thus, "'[a] plan administrator is not obligated to accept or even to give particular weight to the opinion of a claimant's treating physician.'"  <u>Medina</u>, 588 F.3d at 46 (quoting <u>Morales-Alejandro v. Med. Card Sys., Inc.</u>, 486 F.3d 693, 700 (1st Cir. 2007)).  Therefore, Liberty was not required to defer to Dr. Gilbert's opinions, and the fact that Liberty gave the opinions little weight does not demonstrate that its decision was arbitrary and capricious.

2.   <u>Other Evidence</u>

Goodwin also argues that Dr. Glassman's and Dr. Klein's opinions are flawed in that they fail to explain why Goodwin improved on or about February 13, 2009, because Liberty had determined that she was disabled prior to that point.  She argues, therefore, that Liberty improperly relied on Dr. Glassman's and Dr. Klein's opinions, and that Liberty's decision to terminate her benefits was not supported by substantial evidence.

The First Circuit has held "that substantial evidence must support a plan fiduciary's decision to terminate benefits in light of its initial finding of disability."  <u>Fifield v. HM Life Ins. Co.</u>, 900 F. Supp. 2d 110, 118 (D.N.H. 2012) (discussing the holding of <u>Cook</u>, 320 F.3d at 119); <u>see also</u> <u>Keough v. Liberty Life Assur. Co. of Boston</u>, 2005 WL 428581, at *13 (D.N.H. Feb. 24, 2005).  Thus, in order to find a claimant no longer disabled after granting benefits, an insurer must cite "contradictory medical evidence in the record to support its decision to reject [existing] evidence."  <u>Keough</u>, 2005 WL 428581, at *13; <u>see also</u> <u>McOsker v. Paul Revere Life Ins. Co.</u>, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."); <u>Walker v.</u>

17

Grp. Long Term Disability Ins., 256 F.3d 835, 840 (8th Cir. 2001)
("Nothing in the claims record justified [the administrator's]
decision that a change of circumstances warranted termination of
the benefits it initially granted.").

Liberty points to several pieces of information which
justified its decision to terminate benefits.  Liberty relied in
part on the surveillance videos and accompanying reports it
obtained in July and September of 2008, which suggested that
Goodwin's limitations are less severe than she and Dr. Gilbert
had stated.  See Gross v. Sun Life Assur. Co. of Canada, 734 F.3d
1, 25 (1st Cir. 2013) ("We have long recognized that even limited
surveillance is a useful way to check the credibility of
individuals who claim disability based on symptoms that are
difficult to evaluate through objective tests."); Cusson, 529
F.3d at 229; Tsoulas v. Liberty Life Assur. Co., 454 F.3d 69, 80
(1st Cir. 2006).

Liberty also relied on the opinions of Dr. Glassman and Dr.
Klein, both of whom stated that Goodwin had at least full-time,
sedentary work capacity.  Although Goodwin argues that both
doctors were required to explain how her condition improved as of
February 13, 2009, that argument is without merit.  The burden is
on Liberty to point to evidence in the record to justify a
decision to terminate benefits after granting them.  That burden

does not fall on Dr. Glassman or Dr. Klein, physicians who had never before offered an opinion as to Goodwin's disability.[8]

In short, in reaching the decision to terminate Goodwin's benefits in February of 2009, Liberty relied on evidence that contradicted the evidence it had relied upon in initially granting Goodwin LTD benefits under the Plan.[9]  Therefore, Liberty's decision to terminate Goodwin's LTD benefits was not arbitrary or capricious.  See Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 216 (1st Cir. 2004) ("[I]n the presence of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion.").

## Conclusion

For the foregoing reasons, the defendant's motion for judgment on the administrative record (document no. 17) is

---

[8] Indeed, Dr. Klein was specifically tasked with determining Goodwin's limitations from February 14, 2009, onward.  Dr. Glassman based his opinion largely on his examination of Goodwin in January of 2009 and her recent medical record.

[9] Goodwin also points to the SSA's determination of disability on October 31, 2008.  Although the SSA's determination may weigh in favor of a finding of disability under the Plan, "'benefits eligibility determinations by the Social Security Administration are not binding on disability insurers.'" Morales-Alejandro, 486 F.3d at 699 (quoting Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000)).  Thus, Liberty permissibly provided Goodwin with benefits throughout 2007 and 2008 despite the SSA's denial of benefits to Goodwin on April 23, 2007, and December 16, 2007, and terminated benefits in February of 2009 despite the SSA decision that Goodwin was disabled in October of 2008.

granted.  The plaintiff's motion for judgment on the administrative record (document no. 14) is denied.  The clerk of court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

March 4, 2014

cc:  William D. Pandolph, Esq.
     Shawn J. Sullivan, Esq.